### Application of GENERAL DEVELOPMENT UTILITIES, Inc.
Docket No. R-750769-WS(CR).     Order No. 7407.

Florida Public Service Commission.

August 27, 1976.

R. M. C. Rose, Tallahassee, for the applicant.

Leon F. Olmstead, Tallahassee, for the commission and the public generally.

The following commissioners participated in the disposition of this matter — WILLIAM T. MAYO, Chairman; and Commissioner PAULA F. HAWKINS.

## BY THE COMMISSION.

Pursuant to notice the commission by its duly designated hearing examiner, William B. Thomas, held a public hearing on this matter in Port St. Lucie on June 22 and 23, 1976.

All parties waived further participation herein by the examiner. Having considered all of the evidence, we now enter our order.

This application was filed on December 19, 1975. Pursuant to Section 367.081(5), Florida Statutes, by Order No. 7067, dated January 7, 1976, we suspended the utility's proposed rates.

The principal officers of the utility are: Harold E. Schmidt, President; Cyrus E. Hornsby, Treasurer; George V. Flagg, Vice-President; and Donald M. Homer, Secretary.

The utility, a wholly owned subsidiary of General Development Corporation, operates water and sewer systems in several counties in Florida, including these systems in St. Lucie County. Certificate Nos. 6-W and 4-S have been issued to the company for the systems herein concerned.

### Customer testimony

Thirteen customers testified at the hearing. The president of the committee representing various homeowners' associations and an accountant employed thereby, presented a summary of comments and an analysis of the utility's financial documents.

One customer complaint was related to storm drainage which is not part of these proceedings, so this testimony must be disregarded. (TR-47)

One customer advanced the thesis that the systems belong to the customers and the rate increase should be denied for various reasons. A careful review of Exhibit B-17 provides no basis for concluding the customers own the systems. The matter of rates must be resolved within the parameters of Chapter 367, Florida Statutes, as discussed later herein.

Section 367.081(2), Florida Statutes, provides —

The commission shall, after notice and hearing, either upon request or upon its own motion, fix rates which are just, reasonable, compensatory, and not unjustly discriminatory. In all such proceedings, the commission shall consider the value and quality of the service and the cost of providing the service, which shall include, but not be limited to, debt interest, the utility's requirements for working capital, maintenance, depreciation, tax and operating expenses incurred in the operation of all property used and useful in the public service, and a fair return on the utility's investment in property used and useful in the

public service. The commission shall also consider the utility's investment in property required by duly authorized governmental authority to be constructed in the public interest within a reasonable time in the future, not to exceed 24 months.

Section 367.111(2), Florida Statutes, provides —

Each utility shall provide to each person reasonably entitled thereto such safe, efficient and sufficient service as is prescribed by chapter 10 D-4, Florida Administrative Code for Water Systems, and chapter 17-4, Florida Administrative Code for Sewer Systems, but such service shall not be less safe, efficient, and sufficient than is consistent with the approved engineering design of the system and the reasonable and proper operation of the utility in the public interest.

Mr. Charles Goldman, 240 Sandia Drive, complained of a malfunctioning lift station which causes sewage to back up into the homes and overflow into the street. The most recent two occurrences were on June 19, 1976, four days before the hearing. Mr. Goldman's sister-in-law, Mrs. Joan Campbell, 181 Aranja Drive, had effluent back up into her home. The lift station has malfunctioned several times prior to June 19, 1976. (TR 15-21)

Mrs. George Spangler, 1345 Sansovina Terrace, complained of objectionable odors from both the water and sewer systems. The sewer odors are persent in the shower and toilet as well as outside the home. The water smells of excessive chlorine. Complaints have been made to the utility but when the utility personnel took samples, the water was clear but the odor was still present. (TR 35-39)

Mrs. Robert Elsworth, 1468 San Jeronimo Road, complained of stains which build up in cups and in pots. Examples were presented to demonstrate her point. These stains have to be removed by acid or by scouring with such as a brillo pad. She also complained of low pressure, the worst being about 7 P.M., especially during the winter season. The utility offered to make a pressure check at the Elsworth home and provide copies thereof. (TR 40-47) These have not been filed.

Mr. Charles H. Simmons, 768 Airoso Boulevard, complained of cloudy water, low water pressure and objected to the proposed rates. The cloudy water is more prevalent during the high usage periods. (TR 48-54)

Mr. William J. Maitre, Jr., 273 Northeast Camelot Drive, complained of brown water during the winter dry spell. He brought a container of water, drawn in February, 1976, to demonstrate his point. The water was drawn from the kitchen tap in the early afternoon. It was light brown in color, with obvious sediment settled in the bottom of the container. Mr. Maitre advised he noticed that the water became clearer after the rain started.

He also experienced low water pressure during the high usage periods (January and February, 1976). Improvement in the water pressure was noted in April, May and June, 1976.

Mr. Joseph Glumb, 148 Saliata, complained the water left reddish stains on the laundry about January and February of 1976. Also, the water was cloudy — like lime — and left white spots on glasses and sediment built up on the bottom of the water closet. A small bottle containing some of the accumulations was presented to demonstrate his complaint about the sediment build-up. He said there was also a sewer-like odor to the water, which was more prevalent in the morning and during the winter months.

Mr. George Hanner, 144 Naranja Drive, presented two filter elements taken from the water filter in his home, to demonstrate his complaint about the rust-colored water. One filter was to demonstrate the original color of the filter, the other the condition of the filter after a period of use. He has one such filter under the sink in his kitchen and one ahead of the hot water tank, and changes filter elements about every three months. The unused filter presented was white, the used filter was a tea color, after eight days' use.

Mrs. Olga Imperati, 1799 Moarland, also complained of water odor and stains from the water. She characterized the odors as sulfur and chlorine, and stated that, when cold, it was less objectionable.

Mr. Clarence Bitzer, with the Florida Department of Environmental Regulation (DER), after visual examination of the small bottle of sediment presented by Mr. Glumb, stated it appeared to be lime from the lime softening purification process, quite likely from the North Port plant. The rust-colored water, in his opinion, was also due to the presence of lime in the water. Correction of the problem required technical adjustments at the treatment facility. (TR 114-118) Mr. Bitzer found the chlorine to be within the required levels.

Mr. Gavin Pulvermuler, of the Department of Environmental Regulation, responsible for waste water, found the Port St. Lucie sewage treatment plants were providing the required levels of treatment and were not hydraulically overloaded.

In the prehearing investigation, our staff found inadequacies in the company's records, as follows —

1. Capital projects were not supported by work orders, purchase orders, estimates, plans or sketches, as-built plans, or Health Department and/or DER approvals (EX. 7, p.1)

2. There is no accounting, by work orders or otherwise, showing retirement of assets or plant held for future use. (EX. 7, p.2)

3. Maps and records do not show size, location, date of installation, and cost of major items of plant and extension of facilities. (EX. 7, p.2) (See 25-10.27, F.A.C.)

4. The quantity of water produced and delivered to the system, or total volume of sewage treated, was not provided. (Meter readings appear to have been estimated). (EX. 7)

The utility did not offer evidence in rebuttal of the customer complaints regarding service, or the staff's findings concerning inadequacies in the company's records.

Section 25-10.177, Florida Administrative Code, provides as follows —

*Burden of Proof and Audit Provisions.* — In each instance, the utility must be able to support any schedule submitted, as well as any adjustments or allocations relied on by the utility. The work sheets, etc., supporting the schedules and data submitted must be organized in a systematic and rational manner so as to enable commission personnel to verify the schedules in an expedient manner and minimum amount of time. The supporting work sheets, etc.,shall list all reference sources necessary to enable commission personnel to trace to original source of entry into the financial and accounting system and, in addition, verify amounts to the appropriate schedules.

Utilities may request a waiver of specific parts of the above rule from the commission by submitting a written statement setting forth the reason, in detail, why the waiver should be granted.

While the DER test may have shown an adequate level of operation at the Port St. Lucie sewage treatment plant at the time the test was made, we think the testimony of the public witnesses is more indicative of the overall level of service being provided by the petitioner. That testimony, which was uncontroverted by the company, can be summarized to say that the water service was subject to discoloration or "brown water," low pressure, sediment and undesirable odors while malfunctions of the lift station cause a backup of sewage into the customers' homes. We find this level of service to be unacceptable for a company of this size and will require that reasonably satisfactory service be rendered prior to any increase in rates. Further, the company offered no valid reasons why it did not maintain adequate records so this commission can fulfill its statutory mandate to regulate.

Accordingly, we find that the company has neither complied with Section 367.111(2), Florida Statutes, or Sections 25-10.27 and 25-10.177, Florida Administrative Code, and therefore conclude that the petition of General Development Utilities, Inc., for an increase in rates to customers of its North and South Port St. Lucie water and sewer systems should be denied until such time as they are complying.

It is therefore ordered that the petition of General Development Utilities, Inc., 1111 South Bayshore Drive, Miami 33131, for an increase in rates to customers of its North and South Port St. Lucie water and sewer systems in St. Lucie County is denied.